CITY NATIONAL BANK OF MIAMI, as Trustee of Lloyd Moriber and Joan Jones Webb, Lloyd Moriber, and Joan Jones Webb, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 93–249L.

United States Court of Federal Claims.

Aug. 8, 1995.

Ira W. Berman, New York City, for plaintiffs; Thomas C. Murray, Jr., Berman & Murray, of counsel.

Fred R. Disheroon, Washington, DC, with whom was Asst. Atty. Gen. Lois J. Schiffer, for defendant; William A. Baxter, U.S. Army Corps of Engineers, of counsel.

## OPINION

MILLER, Judge.

The matter is before the court on defendant's motion for summary judgment and plaintiff's motion *in limine*. The issue is whether plaintiff's [1] failure to comply with the Comprehensive Development Master Plan for Metro–Dade County (the "Comprehensive Plan"), adopted by the Dade County Board of County Commissioners in 1988, forecloses his takings claim. Argument is deemed unnecessary.

## FACTS

The material facts relevant to this dispute are set forth in *City National Bank v. United States*, 33 Fed.Cl. 224 (1995), which provisionally denied plaintiff's motion *in limine*, and ordered further briefing on defendant's summary judgment motion. Plaintiff has not contested defendant's proposed findings of uncontroverted facts.

The following outlines both the parties' arguments contained in the two motions and the legal conclusions set forth in *City National Bank*, 33 Fed.Cl. 224. The issue posed by the parties' motions involves the elements to be considered in determining the pre-taking value of the property at issue. *See City Nat'l Bank*, 33 Fed.Cl. at 231. Through his motion *in limine*, plaintiff sought to exclude evidence of certain state and county regulations in defining the pre-taking value.

Specifically, plaintiff sought to exclude evidence of: 1) the dredge-and-fill permit program administered by the State of Florida's Department of Environmental Regulation (the "DER") pursuant to chapter 403 of the Florida Statutes; 2) the surface water management permit program administered by the South Florida Water Management District pursuant to chapter 373 of the Florida Statutes; 3) the Dade County Class IV permit program administered by the Dade County Environmental Resources Management Department, pursuant to section 24–58 of the Dade County Environmental Protection Ordinance Coastal and Freshwater Wetlands Regulations; and 4) the 1988 Comprehensive Plan administered by the Dade

1. As explained in *City National Bank v. United States*, 30 Fed.Cl. 715, 716 n. 1 (1994) (order denying defendant's motion for summary judgment), the court will refer to Dr. Moriber as a singular "plaintiff."

County Planning Department and required by chapter 163 of the Florida Statutes.[2] Because compliance with these four programs is necessary to mine limerock on the subject property, plaintiff seeks to exclude evidence of such programs in order to preclude defendant from asserting that the property pre-taking was already devalued such that the permit denial by the United States Army Corps of Engineers (the "Corps"), which effectively prohibited limerock mining, had no effect.

In support of his contention that these regulations should be excluded, plaintiff argues that because the Federal Government, through the Clean Water Act, 33 U.S.C. §§ 1251–1387 (1988) (the "CWA"), and the Coastal Zone Management Act, 16 U.S.C. §§ 1451–1464 (1988) (the "CZMA"), dictates the content and application of the four state and county regulatory measures, it would be a "manifest injustice" to allow defendant to introduce evidence concerning the effects of such requirements. Plf's Br. filed Jan. 11, 1995, at 45. Thus, plaintiff urges the court not to countenance the use by federal and state governments of each other's environmental regulations as a total defense to a takings claim since such a ruling would leave landowners whipsawed without a forum in which to seek relief guaranteed by the Constitution.

Defendant rejoins that "neither the Clean Water Act [CWA] nor the CZMA in any manner compel the State to adopt state statutes or limit the State's ability to regulate its own resources under its police power...." Def's Br. filed Jan. 30, 1995, at 19. Defendant further argues that plaintiff's failure to comply with the applicable regulations should foreclose his takings claim against the United States because plaintiff could not legally pursue limerock mining on his property prior to the date on which the Corps denied the CWA § 404 permit. On this ground, defendant seeks summary judgment.

Identifying the critical issue to be the effect of the Comprehensive Plan on the pre-taking value of the subject property, the court held in abeyance the ruling as to the propriety of allowing defendant to introduce evidence of the three state and county environmental regulatory programs in determining pre-taking value. *City Nat'l Bank*, 33 Fed.Cl. at 232. The court ruled that no nexus existed between the CWA and CZMA and Dade County's 1988 Comprehensive Plan that would be sufficient to impute liability resulting from the effects of the plan to the Federal Government. The court noted: "The Comprehensive Plan is tantamount to a zoning scheme, which for years has been construed as uniquely within the province and competency of local governments." *Id.* at 231 (citing cases). Thus, the court concluded that plaintiff had not sufficiently established that evidence concerning the Comprehensive Plan should be excluded in determining the pre-taking value of the property.

The court also found that the Comprehensive Plan defined the area in which plaintiff's property is located as Environmental Protection Subarea B. *City Nat'l Bank*, 33 Fed.Cl. at 232–33. Limerock mining in that area is inconsistent with the Comprehensive Plan, which required landowners who sought to utilize their land for such purpose to seek both a Master Plan amendment or redesignation, as well as an unusual use variance. To avoid a finding that the Corps' permit denial did not affect the value of the land, the court directed plaintiff to demonstrate that a reasonable probability existed that plaintiff would have obtained both the required Master Plan amendment or redesignation to the 1988 Comprehensive Plan and the unusual use variance. *Id.* at 233 (explaining that for plaintiff to mine limerock on his land, he must obtain Master Plan amendment or redesignation to 1988 Comprehensive Plan and unusual use variance).

In ruling on defendant's motion for summary judgment, the court is mindful of the precedents admonishing against precipitous grants of summary judgment in fact-specific takings cases and has scrutinized the record to assure that no material facts are in dispute, that all presumptions and inferences

---

**2.** These citations refer to the chapters of the Florida Statutes in effect both at the time plaintiff submitted his second permit application in 1991 and for the period during which the United States Army Corps of Engineers evaluated that application.

are drawn in plaintiff's favor, and that defendant has discharged its burden to establish entitlement to summary judgment as both a matter of fact and law.

## DISCUSSION

 In his supplemental brief, plaintiff concedes that he cannot show that a reasonable probability existed that he would have obtained both the required Master Plan amendment or redesignation to the 1988 Comprehensive Plan and the unusual use variance. Instead of proffering the requested evidence, plaintiff begs the court's indulgence to reconsider the issue of the relationship between the Comprehensive Plan and the CWA and CZMA.[3] Plaintiff posits several new arguments, which purport to establish a sufficient nexus between the Federal Government and the Comprehensive Plan, such that the court should exclude evidence of the plan in determining pre-taking value.

Unfortunately, the commendable zeal that plaintiff brings to his arguments is not matched by their clarity. The court can identify only one argument that warrants attention. Plaintiff contends that the Comprehensive Plan cannot be construed as uniquely local in nature because the plan must be approved by the state prior to implementation and must meet certain state requirements, including that the plan identify wetlands in environmental protection categories and that the wetlands' land-use designation be "consistent with applicable state law and rules." Fla.Stat.Ann. § 163.3177(6)(d) (West 1992). Plaintiff further maintains that the State of Florida's wetlands program is "prescribed by Federal limitations," thus establishing a sufficient nexus. Plf's Br. filed May 10, 1995, at 13.

In its earlier order the court focused on the uniquely local nature of the Comprehensive Plan. *See City Nat'l Bank,* 33 Fed.Cl. 224. Plaintiff makes a valid point that the Comprehensive Plan is mandated by state statutes, as set forth in chapter 163 of the Florida Statutes. Even though the plan is not a local zoning ordinance in the traditional sense that the court discussed in its order, plaintiff must raise a genuine issue of material fact as to whether the nexus with the Federal Government is present. It is plaintiff's own formulation that such a nexus is required in order to exclude evidence of the local plan in determining pre-taking value.

To demonstrate the federal nexus, plaintiff cites to several blanket references to the phrase "federal law" in state statutes, contending that these references prove a sufficient nexus to hold the Federal Government answerable for the zoning-type limitations expressed in the Comprehensive Plan. For example, plaintiff states:

> The State Plan categorically declares not only its authority over subject-issue local planning, but the Federal nexus for it all. *E.g.,* Chapter 186 at § 186.502 of the Florida Statutes declares, *inter alia,* that 'Federal and State programs should have coordinated purposes and consistent policy direction ... to carry out a wide variety of Federal and State program designations.' And,

> It is the declared purpose of this act to establish a common system of regional planning councils for area wide coordination and related cooperative activities of *federal, state and local governments.* [emphasis added]

Plf's Br. filed May 10, 1995, at 12 (emphasis in original). These generic references to federal programs are insufficient to tie the CWA and CZMA to Dade County's 1988 Comprehensive Plan.

Plaintiff also argues "that water quality (which 'standards' are commanded by the Federal Clean Water Act) is a zoning determinant; [and] that substantive requirements of the Clean Water Act are taken into account in developing planning standards...." Plf's Br. filed May 10, 1995, at 13. In sup-

3. In *haec verba* plaintiff states:
 Plaintiffs' [sic] cannot present such evidence as the Provisional Order would require, but yet present that the nexus as previously presented, and re-argued hereinbelow, is the cause of that circumstance—and that, whereas the Federal regulations, and Florida regulations subject of the Federal–Florida nexus, assure the impossibility of such proof as the Provisional Order invites, Plaintiffs' motion *in limine* should yet be granted.

port of these assertions, plaintiff cites the deposition of Jean Evoy, currently Chief of Freshwater Wetlands Section, Dade County Department of Environmental Resources Management, and formerly Principal Environment Planner for the Dade County Planning Department. The deposition testimony, however, does not stand for the propositions that plaintiff urges. Instead, it reveals only that the state required the localities to identify high-quality wetlands and to classify them as environmental protection areas. Plaintiff's assertions, without more, cannot preclude entry of summary judgment. *Levi Strauss & Co. v. Genesco, Inc.*, 742 F.2d 1401, 1404 (Fed.Cir.1984) (holding that assertions of counsel cannot substitute for factual statements under oath that establish a genuine issue of material fact).

Citing a separate passage of Ms. Evoy's deposition, in which she quotes the Comprehensive Plan, plaintiff asserts that it demonstrates the federal water quality standards' "nexus to Zoning Regulations." Plf's Br. filed May 10, 1995, at 14. The passage states: " 'Protection area uses will be closely regulated to ensure the protection of water quality.' " Deposition of Jean Evoy, Dec. 5, 1994, at 9. Although this passage references the term *water quality, standing* alone it does not link the Comprehensive Plan to the Federal Government's water quality standards program under CWA § 303(a), 33 U.S.C. § 1313(a). The other statements from Ms. Evoy's deposition upon which plaintiff relies are taken out of context and similarly unhelpful.

The federal water quality standards program requires states to develop, pursuant to their own laws, water quality standards applicable to intrastate waters and to submit such standards to the United States Environmental Protection Agency (the "EPA") for approval. The EPA then approves or rejects such standards. Rejected standards are returned *to the state for modification.* Sections 303(a)(1), (a)(2), and (a)(3)(C) provide

that where a state fails to adopt water quality standards or make requested revisions, the EPA shall promulgate standards for the state. *See* CWA § 303(b).

Plaintiff finds a link between the Comprehensive Plan and the federal water quality standards program, in that the state approves the Comprehensive Plan, the state is subject to the requirements of the federal water-quality program, and state law requires that the wetlands land-use designation identified in the Comprehensive Plan be "consistent with applicable state law and rules." Fla.Stat.Ann. § 163.3177(d). This link is too attenuated. The reference to compliance with "applicable state law and rules" is too general to link the Federal Government's water quality standards program with the Comprehensive Plan, developed as a planning tool.

The court wishes to point out two fundamentally different situations involving the Federal Government and state regulations. One scenario allows the Federal Government to compel a state to implement a certain portion of a federal program and, when the state fails to do so, implement the program on behalf of the state or to authorize the state to implement a federal program. The other scenario finds a situation wherein the state, not counselled by the Federal Government or acting for the Federal Government, requires state and local participation in the achievement of a federal goal.[4] *See Adolph v. FEMA*, 854 F.2d 732, 735–36 (5th Cir. 1988) (finding no federal coercion such that takings claim would lie against Government where parish participated in voluntary federal program). The latter scenario describes the Comprehensive Plan. The Federal Government did not compel the state and local governments to develop specific requirements in the Comprehensive Plan, nor did the Federal Government delegate administration of a federal program to the state and local governments.

---

4. Although the court notes this distinction, the court reserves judgment as to whether the state dredge-and-fill program is sufficiently linked to the federal Government via the federal water quality standards to allow a landowner to prevent the Federal Government from producing evidence as to the state permit program in establishing the pre-taking value of property—a result which would avoid placing landowners in a whipsawed position. The case at bar can be disposed of without resolving this issue.

Although Ms. Evoy referred to Dade County's interest in protecting water quality, an arguable federal interest, this statement alone does not create a nexus between the Comprehensive Plan and the Federal Government. The fact that the Federal Government shares a common goal with states and localities in protecting water quality does not open the Federal Government to liability for the effects of a similar local planning tool. In addition, the Federal Government cannot be held liable merely because the state approved a local planning program and required that the program identify high-quality wetlands as environmental protection areas.

Plaintiff points to the federal nexus derived from the State of Florida's efforts to seek authorization to implement its own permit programs pursuant to CWA §§ 402(b) and 404(g). These provisions authorize states to develop permit programs consistent with the general requirements of sections 402 and 404 and submit such plans to EPA for approval. If EPA approves a program, then the state implements that program and the state's program operates in lieu of the CWA §§ 402 and 404 permit programs. Thus, when a state has received authorization pursuant to section 404(g), a landowner seeking a dredge-and-fill permit for limerock mining need only apply for a state permit, whereas a landowner in a non-authorized state must obtain both state and federal permits. Plaintiff's nexus theory based on these state authorization provisions fails because the State of Florida has not yet received federal authorization to administer the programs at issue, specifically the section 404 program.

Plaintiff's other nexus arguments, such as his claim of inter-governmental conspiracy to devalue his land, are unpersuasive. A disputed material issue of fact is not present concerning the CWA and CZMA and the Comprehensive Plan. Because plaintiff has not raised a question of fact concerning whether the Federal Government dictates through the CWA and CZMA the content and application of the Comprehensive Plan, so that it would be a "manifest injustice" to allow defendant to introduce evidence concerning the effects of the plan's requirements, evidence concerning the plan is admissible in determining pre-taking value.

Plaintiff concedes that prior to the Corps' permit denial, his previously issued unusual use permit had expired. In addition, plaintiff admits that he could not demonstrate that a reasonable probability existed that he could obtain the required Master Plan amendment or redesignation to the Comprehensive Plan and the unusual use variance. Thus, prior to the Corps' permit denial, plaintiff could not mine limerock, given that his land was located in Environmental Protection Subarea B of the Comprehensive Plan. Limerock mining was not a permitted use in Subarea B, without a Master Plan amendment or redesignation. *City Nat'l Bank,* 33 Fed.Cl. at 233.

Accordingly, the Corps' denial of the CWA § 404 permit, which admittedly disabled plaintiff from mining limerock, did not affect the value of the property.[5] Resolution of this issue obviates the need to address the other issues posed by plaintiff's motion *in limine,* such as the relationship, if any, between the state and federal environmental regulatory systems and, assuming such a relationship, the proper allocation of takings responsibility between the governmental actors.

■ In an effort to appeal to the court's conscience, always alert to overreaching in takings cases, plaintiff asserts that "[i]n effect, the Federal Government has stayed Plaintiffs' rock-mining operations *since 1977.*" Plf's Br. filed May 10, 1995, at 7 (emphasis added).[6] Plaintiff also cites for-

---

5. The court notes that this order solely addresses the issue of valuation. The court previously ruled that plaintiff held a compensable property interest at the time he purchased the property in 1972. *City Nat'l Bank,* 33 Fed.Cl. at 232 n. 12. However, since a ruling that plaintiff cannot establish the value of his property for mining limerock as of the date of taking forecloses any monetary recovery, defendant's instant motion resolves the case.

6. Plaintiff's argument, in full, reads:

While the law assigns that Plaintiffs' regulatory-taking claim was not persuable as such before the final element occurred upon the Federal Government's denial of their permit application in 1993, the Government should not benefit from the fact that it has never made an honest 'conversion' of Clean Water Act regulations to reflect the 'no-permit' prohibition of its 'wetland policy.' Thus, while the artifice of

mer Chief Judge Kozinski's finding in *Florida Rock Indus., Inc. v. United States*, 8 Cl.Ct. 160, 178–79 n. 23 (1985), that the Government had "a deliberate, but unannounced, policy of 'zoning' the area west of the Dade–Broward levee ... as undisturbed wetlands where no significant development would be permitted," as further evidence of how the Government stayed plaintiff's activities on the subject property. Plaintiff's reliance on the latter finding is unpersuasive given that the Federal Circuit set aside those findings.[7] *See Florida Rock Indus., Inc. v. United States*, 791 F.2d 893, 905 (Fed.Cir.1986), *cert. denied*, 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987), *on remand*, 21 Cl.Ct. 161 (1990), *vacated*, 18 F.3d 1560 (Fed.Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 898, 130 L.Ed.2d 783 (1995).

Undeniably, the Corps issued a cease and desist letter to plaintiff dated December 2, 1977, prohibiting limerock mining on the property until such time as plaintiff acquired the required dredge-and-fill permit pursuant to CWA § 404. Plaintiff, however, made a tactical litigation decision in 1981[8] to postpone pursuing the required state and federal regulatory requirements until such time as the courts had resolved *Florida Rock*, a case involving the Corps' denial of a CWA § 404 permit for a parcel of land adjacent to plaintiff's property.

In 1991, a decade after making his litigation decision, plaintiff reapplied to the Corps for a CWA § 404 permit and to the DER for the state dredge-and-fill permit required pursuant to Chapter 403 of the Florida Statutes. The Corps denied the federal permit on March 8, 1993. Although the facts of this case are unique in that the Corps' permit denial occurred 16 years after the issuance of the cease and desist order, the Federal Government cannot be held responsible for the delay. Plaintiff, not the Federal Government, caused the delay by failing to actively pursue a CWA § 404 permit until 1991.

Federal permit possibility has relegated Plaintiffs to a March 1993 presumptive-taking date, it cannot be regarded that all elements of the claim sprung into legal being only upon the event of the final element—and the presumptive-taking date 'settlement' should not free the Government of responsibility having reference to elements of the presumptive-taking claim anteceding the denial of Plaintiffs' permit application. In effect, the Federal Government has stayed Plaintiff's rock-mining operations since 1977. Consequently and Constitutionally, subsequent regulations that mimic the Federal wetland-policy restrictions, *nexused or not*, should not work as a Federal defense.

Plf's Br. filed May 10, 1995, at 9–10 (emphasis added).

7. Plaintiff also appears to rely on former Chief Judge Kozinski's finding with respect to his nexus argument entitled, "The Then–And–Now of Zoning Regulations." Plf's Br. filed May 10, 1995, at 5. Any reliance on that finding is inappropriate. Plaintiff indicates that the variance it and Florida Rock obtained in 1976, pursuant to the then-current zoning scheme, included the same proscription of "one dwelling unit per five acres" as is included in the Environmental Protection Subarea B designation in the Comprehensive Plan, where plaintiff's property is located.

Although plaintiff does not appear to argue that the duplication of provisions illustrates that he could have obtained an unusual use permit under the Comprehensive Plan, the court addresses the issue for purposes of completeness. Plaintiff asserts that the Comprehensive Plan cannot serve to defeat his claim because the zoning in effect in the 1970s, when he and Florida Rock obtained their unusual use permits, included the same on-dwelling-per-five-acres restriction as did the Comprehensive Plan. According to plaintiff, this restriction did not defeat Florida Rock's claim. However, plaintiff's reliance on the duplicative requirement, without more, establishes nothing.

Examination of the Comprehensive Plan shows that the one-dwelling-per-five-acres restriction is included not only with regard to Environmental Protection Subarea B, where limerock mining is not allowed without a Master Plan amendment or redesignation and unusual use variance, but also is included for the land use designation "Open Land"—a designation which specifically allows for limerock mining in certain defined Subareas. Thus, the inclusion of the restriction does not necessarily mean that plaintiff could mine limerock on the property as of 1988. In addition, the Comprehensive Plan is more stringent than the previous plan, under which plaintiff's now-expired unusual use permit had been granted and under which Florida Rock's permit was granted. The Comprehensive Plan requires applicants for limerock mining in Environmental Protection Subarea B to obtain both a Master Plan amendment or redesignation and an unusual use variance.

8. April 21, 1981 marks the date on which plaintiff decided to postpone the regulatory requirements. On that date plaintiff voluntarily withdrew his appeal of the state agency's permit denial, which was issued on September 22, 1980.

Moreover, the court notes the inconsistency in plaintiff's argument. Earlier in the proceedings, plaintiff argued, in response to defendant's argument based on the statute of limitations, that the taking occurred on March 8, 1993, for purposes of the six-year statute of limitations. Today plaintiff posits that the taking actually occurred in 1977, because the Corps effectively stayed plaintiffs' activities since that date. The court denies plaintiff's efforts to, on the one hand, use the statute of limitations as a shield, yet, when wielding its sword of advocacy, ignore the principle. In effect, plaintiff's argument would make a mockery of the statute of limitations. *See United States v. Kubrick,* 444 U.S. 111, 117, 100 S.Ct. 352, 356–57, 62 L.Ed.2d 259 (1979) (stating that statutes of limitations "represent a pervasive legislative judgment that it is unjust to fail to put the adversary on notice to defend within a specified period of time and that 'the right to be free of stale claims in time comes to prevail over the right to prosecute them....'") (quoting *Railroad Telegraphers v. Railway Express Agency,* 321 U.S. 342, 349, 64 S.Ct. 582, 586, 88 L.Ed. 788 (1944)). The taking date in this case was March 8, 1993, the date of the Corps' permit denial. In determining the pre-taking value, the court must look to the value of the land prior to that date, which requires an analysis of the effects of the Comprehensive Plan as it pertains to plaintiff's property.

Plaintiff also notes that he stopped renewing his Dade County unusual use permit, issued originally in 1977 under a different Comprehensive Plan, because "the Federal regulations precluded the opportunity subject of the permit and thus 'precluded' the value of the permit." Plf's Br. filed May 10, 1995, at 3 (citation omitted). Plaintiff's decision not to renew his unusual use permit, in retrospect, appears to have been an unwise tactical decision. By delaying application for the federal permit, plaintiff was under an obligation to remain current with existing local planning requirements, which, as plaintiff is aware, became more stringent in 1988 with the implementation of the Comprehensive Plan.

Thus, plaintiff's pronouncement that the Federal Government adversely had affected his property since 1977 bears no relevance on whether the court should consider the Comprehensive Plan in determining the pre-taking value of the subject property.

## CONCLUSION

Accordingly, based on the foregoing, plaintiff's motion *in limine* is denied, and defendant's motion for summary judgment is granted. The Clerk of the Court shall enter judgment dismissing the complaint.

**IT IS SO ORDERED.**

No costs.